UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(AT COVINGTON)


CIVIL ACTION NO. _____


ELIZABETH HERNANDEZ, EXECUTRIX OF
THE ESTATE OF MARK HERNANDEZ, DECEASED

*Plaintiff,*


-against-

**COMPLAINT AND JURY
DEMAND**


3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Company, AGC CHEMICALS
AMERICAS INC., ARKEMA INC., BASF
CORPORATION, CARRIER CORPORATION,
CHEMDESIGN PRODUCTS, INC, CHEMGUARD,
INC., CLARIANT CORPORATION, CORTEVA, INC.,
DUPONT DE NEMOURS INC., f/k/a DOWDUPONT,
INC., DYNAX CORPORATION, EIDP, Inc. f/k/a E.I.
DUPONT DE NEMOURS AND COMPANY, individually
and as successor in interest to DuPont Chemical Solutions
Enterprise, KIDDE-FENWAL, INC., NATIONAL FOAM,
INC., THE CHEMOURS COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, THE CHEMOURS COMPANY FC, LLC,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise, TYCO FIRE PRODUCTS
L.P., and UTC FIRE & SECURITY AMERICAS
CORPORATION, INC.,


*Defendants.*


1

## COMPLAINT

Comes Elizabeth Hernandez, Executrix of the Estate of Mark Hernandez, deceased ("Plaintiff"), by and through counsel, Schulte Urbon Yonts, PLLC, and for this Complaint against: 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., EIDP, Inc. f/k/a E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARKEMA INC., AGC CHEMICALS AMERICAS INC., DYNAX CORPORATION, KIDDE-FENWAL, INC., CLARIANT CORPORATION, BASF CORPORATION, UTC FIRE & SECURITY AMERICAS CORPORATION, INC., CARRIER CORPORATION, and CHEMDESIGN PRODUCTS, INC. (collectively "Defendants") allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a civil action for compensatory and punitive damages, costs incurred by Decedent Mark Hernandez ("Decedent Hernandez") and therefore Plaintiff, and any other damages that the Court or jury may deem appropriate for bodily injury and wrongful death arising from the intentional, malicious, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with Aqueous Film-Forming Foam ("AFFF") containing Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic acid ("PFOS") and/or Decedent Hernandez and Plaintiff.  All Defendants were involved in the manufacturing of the

fluorochemical products, the AFFF, and/or the precursors to PFOA and PFOS (collectively hereinafter "fluorochemical products" or "C8") to which Decedent Hernandez was exposed.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

3.      Venue is proper in the United States District Court for the Eastern District of Kentucky in that the events or omissions giving rise to the claim occurred in that district.

4.      The United States District Court for the Eastern District of Kentucky has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the state of Kentucky for active use by Decedent Hernandez during the course of training and firefighting activities. Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Eastern District of Kentucky does not offend traditional notions of fair play and substantial justice.

## PARTIES

### PLAINTIFF

5.      Decedent, Mark Hernandez, was at all times relevant a citizen of the United States of America, and a resident of Clermont County, Ohio until his death.

6.      Decedent, Mark Hernandez, was born on May 18, 1969, and died on September 29, 2023, from his long fight with cancer.

7.      Plaintiff, Elizabeth Hernandez, Executrix was appointed the personal representative of the Estate of Mark Hernandez on February 21, 2024, in the Probate Court of Clermont County Ohio, Case #24-ES-00102. Plaintiff resides at 1080 Infantry Drive, Independence, Boone County, Kentucky 41051.

8.      Decedent Hernandez was exposed to Defendants' fluorochemical products during his service as a firefighter with the Kenton County Airport Board in Boone County, Kentucky.

9.      As a result of his exposure to Defendants' fluorochemical products, Decedent Hernandez was diagnosed with angioimmunoblastic T-cell lymphoma, which caused Decedent Hernandez to undergo multiple rounds of chemotherapy, and to suffer severe personal injuries, pain, and emotional distress, and ultimately causing his death.

10.     The injuries, pain, suffering, emotional distress and his death were proximately caused by Defendants' fluorochemical products.

## DEFENDANTS

11.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

12.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

13.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management,

direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

14.     At all times relevant to this litigation, upon information and belief, each of the Defendants designed, developed, manufactured, marketed and/or sold the AFFF or fluorochemical products containing PFOA or PFOS used by firefighters throughout the country, including in Kentucky.

15.     Each of the Defendants designed, developed, manufactured, marketed and/or sold the AFFF or fluorochemical products containing PFOA or PFOS to which Plaintiff was exposed and directly and proximately caused Decedent Hernandez to develop angioimmunoblastic T-cell lymphoma, and to suffer severe personal injuries, pain, suffering, emotional distress, and death.

16.     **Defendant 3M Company (f/k/a/ Minnesota Mining and Manufacturing Company) ("3M")** is a Delaware Corporation and conducts business throughout the United States, with its principal place of business located at 3M Center, St. Paul Minnesota 55144.

17.     3M Company manufactured, distributed, and sold fluorochemical products and AFFF from the 1960s until 2002.

18.     **Chemguard, Inc.** is a corporation organized and existing under the laws of Texas, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

19.     Upon information and belief, Chemguard is a subsidiary of Johnson Controls International PLC.

20.     **Tyco Fire Products L.P. ("Tyco")** is a limited partnership organized under the laws of Pennsylvania, with its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

21.     Upon information and belief, Tyco is a subsidiary of Johnson Controls International PLC.

22.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

23.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFOA and PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFOA and PFOS.

24.     Upon information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.

25.     **National Foam, Inc.** ("National Foam") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382.

26.     Upon information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd.

27.     **EIDP, Inc.**, f/k/a **E. I. DuPont de Nemours & Company ("DuPont")** is a corporation organized and existing under the laws of Delaware, having a principal place of business is 974 Centre Road Wilmington, Delaware 19805.

28.     DuPont is a successor in interest to **DuPont Chemical Solutions Enterprise** ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

29.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

30.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

31.     The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.

32.     **The Chemours Company ("Chemours")** is a corporation organized and existing under the laws of Delaware, having a principle place of business at 1007 Market Street, Wilmington, Delaware 19801.

33.     In 2015, DuPont spun off its "performance chemicals" business to Chemours along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its performance chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorochemicals and the products that contain fluorochemicals.

34.     **The Chemours Company FC LLC ("Chemours FC")**, a successor in interest to DuPont Chemical, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19801.

7

35.     **Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

36.     **Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

37.     On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off Corteva.

38.     Prior to the separation, DowDuPont owned Corteva as a wholly-owned subsidiary formed in February 2018.

39.     On June 1, 2019, DowDuPont distributed a pro rata dividend of both issued and outstanding shares of Corteva common stock to DowDuPont shareholders.

40.     Corteva holds certain Dow DuPont assets and liabilities including DowDuPont's agriculture and nutritional businesses.

41.     On June 1, 2019 DowDuPont, the surviving entity after the spin-off of Corteva and another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva.

42.     Defendants E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

43.     **Arkema Inc. ("Arkema")** is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

44.     Arkema develops specialty chemicals and fluoropolymers.

45.     Arkema is a successor in interest to Elf Atochem North America and Atofina Chemicals Inc., which manufactured fluorosurfactants containing PFOA that was used in AFFF.

46.     **AGC Chemicals Americas Inc**. (**"AGC Americas"**) is a corporation organized and existing under the laws of Delaware, having a principal place of business in 55 East Uwchlan Avenue, Suite 201 Exton, PA 19341 United States.

47.     AGC Americas operates throughout the United States, manufacturing glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates, including those used in AFFF products.

48.     **Dynax Corporation ("Dynax")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544.

49.     On information and belief, Dynax entered the AFFF business in 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

50.     **Kidde-Fenwal, Inc.** ("Kidde-Fenwal") is a corporation organized under the laws of Delaware, having a principal place of business at 400 Main Street, Ashland, Massachusetts 01721. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb

National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire") and manufactured and sold AFFF.

51.     **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, having a principal place of business at 500 E. Morehead Street, Suite 400, Charlotte, North Carolina 28202.

52.     On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation, and manufactured fluorointermediates used in AFFF products.

53.     **BASF Corporation, ("BASF")**, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

54.     On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

55.     On information and belief, BASF Corporation is the successor in interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., a Swiss specialty chemicals company, that manufactured fluorosurfactants containing PFOA used in AFFF.

56.     **UTC Fire & Security Americas Corporation, Inc. ("UTC")** is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC does and/or has done business throughout the United States and manufactured and sold AFFF.

57.     **Carrier Corporation ("Carrier")** is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier and manufactured and sold AFFF.

Upon information and belief, Carrier does and/or has done business throughout the United States.

58.     **ChemDesign Products, Inc.** is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143, that manufactured fluorosurfactants containing PFOA used in AFFF.

## FACTUAL ALLEGATIONS

### THE FLUOROCHEMICALS: PFOA AND PFOS

59.     Fluorochemical products are man-made chemicals composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. Fluorochemical products that contain eight carbon-fluorine bonds are sometimes referred to as "C8."

60.     Fluorochemical products are highly water soluble, which facilitates the ease at which they spread throughout the environment, contaminating soil, groundwater, and surface water. This mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.

61.     Fluorochemical products are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.

62.     Fluorochemical products are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.

63.     Since they were first produced, information has emerged showing negative health effects caused by exposure to fluorochemical products.

64.     According to the United States Environmental Protection Agency ("EPA"), studies indicate that exposure to fluorochemical products over certain levels may result in developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).

65.     The EPA has also warned that there is suggestive evidence of carcinogenic potential for fluorochemical products.

66.     The EPA has noted that drinking water can be an additional source of PFC's in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, such contamination is typically localized and associated with a specific facility, for example…an airfield at which fluorochemical products were used for firefighting."

67.     The EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

## AQUEOUS FILM-FORMING FOAM

68.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

69.     The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or

PFOS.

70.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

71.     All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

72.     AFFF can be made without PFOA, PFOS, or their precursor chemicals, that do not release PFOA, PFOS, and/or their precursor chemicals into the environment or in humans.

73.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

74.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. Because of their persistence, they are widely distributed throughout soil, air, and groundwater.

75.     Due to the chemicals' persistent nature, among other things, these chemicals caused injury, damage, and Decedent Hernandez's death.

**DEFENDANTS' KNOWLEDGE**

76.     On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

77.     Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens which cause genetic damage.

78.     In 1980, 3M published data in peer- reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

79.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

80.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.

81.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

82.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

14

83.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold fluorochemical products, including Teflon nonstick cookware, and more recently, PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

84.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold fluorochemical products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products.

85.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, distributed, and sold fluorochemical products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products.

86.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River, and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, and/or the environment.

87.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."

88.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from its Washington Works plant reviewed

the available scientific evidence and concluded that a "probable link" exists between PFOA

exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension

and preeclampsia. By October 2012, the C8 Science Panel concluded that a probable link also

exists between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid

disease, testicular cancer, and ulcerative colitis.

89.     In July 2015, DuPont spun off its chemicals division by creating Chemours as a

new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had

dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

90.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed,

manufactured, marketed, distributed, and/or sold AFFF products containing fluorochemicals,

and/or fluorochemical products for use in AFFF; (2) failed to issue instructions on how AFFF

containing fluorochemical products should be used and disposed of; (3) failed to recall and/or

warn the users of fluorochemical products, negligently designed products containing or

degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater

contamination as a result of standard use and disposal of these products; and (4) further failed

and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical

products, notwithstanding the fact that Defendants knew foreseeable the identities of the

purchasers and end-users of the fluorochemical products, as well as the final fate of

fluorochemical products in water and biota, including in humans.

**MARK HERNANDEZ'S EXPOSURE TO AFFF**

91.     Upon information and belief, the Kenton County Airport Board and/or

Cincinnati/Northern Kentucky International Airport has stored and used Defendants' AFFF

containing PFOA or PFOS chemicals and/or their precursor chemicals in firefighter training and

response exercises, including at Cincinnati/Northern Kentucky International Airport, located in Kentucky.

92.    Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF containing PFOA or PFOS chemicals and/or their precursor chemicals to the Kenton County Airport Board and/or Cincinnati/Northern Kentucky International Airport.

93.    The descriptive labels and material safety data sheets for Defendants' AFFF containing PFOA or PFOS and/or their precursor chemicals utilized by firefighters with the Kenton County Airport Board and/or Cincinnati/Northern Kentucky International Airport, did not reasonably or adequately describe the AFFF's risks to human health.

94.    Upon information and belief, the Kenton County Airport Board and/or Cincinnati/Northern Kentucky International Airport, located in Boone County, Kentucky, has stored and used Defendants' AFFF containing PFOA or PFOS chemicals and/or their precursor chemicals in firefighter training and response exercises.

95.    Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF containing PFOA or PFOS chemicals and/or their precursor chemicals to the Kenton County Airport Board and/or Cincinnati/Northern Kentucky International Airport.

96.    The descriptive labels and material safety data sheets for Defendants' AFFF containing PFOA or PFOS and/or their precursor chemicals utilized by firefighters with the Kenton County Airport Board and/or Cincinnati/Northern Kentucky International Airport, did not reasonably or adequately describe the AFFF's risks to human health.

97.    From 2001 to 2022, Decedent Hernandez served as a firefighter with the Kenton County Airport Board, during which time he worked primarily at the Cincinnati/Northern Kentucky International Airport Cincinnati/Northern Kentucky International Airport

Cincinnati/Northern Kentucky International Airport Cincinnati/Northern Kentucky International Airport.

98.     Throughout the duration of Decedent Hernandez's training and service as a firefighter, Decedent Hernandez participated in routine trainings and firefighting activities using, being exposed to, and ingesting Defendants' AFFF and fluorochemical products.

99.     During Decedent Hernandez's use of Defendants' AFFF products containing PFOA and/or PFOS and/or their precursor chemicals, Decedent Hernandez ingested such products, and the PFOA and/or PFOS and/or their precursor chemicals entered Decedent Hernandez's body.

100.    At no point during his trainings or career did Decedent Hernandez receive any warning that Defendants' AFFF products containing PFOA and/or PFOS and/or their precursor chemicals were toxic or carcinogenic.

101.    On November 16' 2021, Decedent Hernandez's doctors diagnosed Decedent Hernandez with angioimmunoblastic T-cell lymphoma.

102.    Decedent Hernandez subsequently underwent chemotherapy to treat his cancer, through the date of his death.

103.    On or around May 4, 2023, Decedent Hernandez discovered that his cancer was caused by exposure to Defendants' AFFF and AFFF-related fluorochemical products.

104.    Decedent Hernandez suffered the effects of his illness proximately caused by exposure to Defendants' fluorochemical products, until his death.

## AS AND FOR A FIRST CAUSE OF ACTION

## PRODUCTS LIABILITY – DEFECTIVE DESIGN – CONSUMER EXPECTATIONS

105.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

106.   At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling, of fluorochemical products.

107.   At all times pertinent to this Complaint, Defendants regularly participated in placing the fluorochemical products into the American stream of commerce.

108.   As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of fluorochemical products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Decedent Hernandez, not to manufacture, sell, and/or market any product which is unreasonably dangerous for its intended and foreseeable uses.

109.   Decedent Hernandez used Defendants' fluorochemical products in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

110. Defendants' fluorochemical products used by Decedent Hernandez did not perform as safely as an ordinary consumer would have expected the products to perform when used as Decedent Hernandez did in an intended or reasonably foreseeable manner because PFOA and PFOS are carcinogens and otherwise harmful to human health.

111.   Defendants' defective design of the fluorochemical products was far more dangerous than plaintiff or an ordinary consumer would expect when used, as Decedent Hernandez did, in an intended and reasonably foreseeable manner.

112.    Defendants' fluorochemical products failure to perform safely was a substantial factor in causing Decedent Hernandez's harm.

113.    Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain harmful fluorochemicals.

114.    These alternative designs and/or formulations were available, practical, and technologically feasible.

115.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by Defendants' manufacture, marketing, and/or sale of fluorochemical products.

116.    The risks of fluorochemical products were not obvious to users of the AFFF, nor were they obvious to users in the vicinity of the AFFF use, including Decedent Hernandez, who were unwittingly exposed to Defendants' toxic and carcinogenic chemicals. Decedent Hernandez could not have reasonably discovered the defects and risks associated with the use of fluorochemical products and could not protect themselves from exposure to Defendants' fluorochemical products.

117.    As a direct and proximate result of Defendants' defective design, Decedent Hernandez and therefore Plaintiff suffered some or all of the following damages:

> a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;
>
> b. Physical injury, both temporary and permanent;
>
> c. Economic Damages;
>
> d. Severe and significant emotional distress and mental pain and suffering;
>
> e. Humiliation, embarrassment and fear;
>
> f.  Loss of enjoyment of life;

g. Loss of life;

h. Annoyance and inconvenience; and

f. Other damages, which, under the law and circumstances, Decedent Hernandez

and therefore Plaintiff is entitled to recover, including attorneys' fees and costs

associated with the prosecution of this action.

118.    As a result of Defendants' design and formulation of a defective product,

Defendants are strictly liable in damages to Decedent Hernandez and therefore Plaintiff.

119.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless

indifference to the rights of Decedent Hernandez and therefore Plaintiff.

## AS AND FOR A SECOND CAUSE OF ACTION

### PRODUCTS LIABILITY – DEFECTIVE DESIGN – RISK-UTILITY

120.    Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint as if restated in full therein.

121.    At all times relevant to the Complaint, Defendants were regularly engaged in the

design, formulation, production, creation, making, construction, assembly, rebuilding, sale,

distribution, preparation, and labeling, of fluorochemical products.

122.    At all times pertinent to this Complaint, Defendants regularly participated in

placing the fluorochemical products into the American stream of commerce.

123.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers,

and marketers of fluorochemical products, Defendants owed a duty to all persons whom

Defendants' products might foreseeably harm, including Decedent Hernandez, not to

manufacture, sell, or market any product which is unreasonably dangerous for its intended and

foreseeable uses.

124.    Defendants' fluorochemical products were defectively designed and manufactured when the products left the hands of Defendants, such that the foreseeable risks associated with the use, storage, and disposal of the fluorochemical products exceeded the alleged benefits associated with its design and formulation.

125.    At all times relevant to this litigation, Defendants' fluorochemical products reached Defendants' intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

126.    Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain harmful fluorochemicals.

127.    These alternative designs and/or formulations were available, practical, and technologically feasible.

128.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by the Defendants' manufacture, marketing, and sale of fluorochemical products.

129.    The fluorochemical products manufactured, sold, or distributed by the Defendants were defective in design because the foreseeable risk of harm posed by the fluorochemical products could have been reduced or eliminated by the adoption of a reasonable alternative design.

130.    As a direct and proximate result of Defendants' defective design, Decedent Hernandez, other exposed individuals, and the public at large have suffered and will continue to suffer some or all of the following damages:

        a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

        b. Physical injury, both temporary and permanent;

22

c. Economic Damages;

d. Severe and significant emotional distress and mental pain and suffering;

e. Humiliation, embarrassment and fear;

f. Loss of enjoyment of life;

g. Loss of Life

h. Annoyance and inconvenience; and

i. Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

131.   As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Decedent Hernandez and therefore to Plaintiff.

132.   Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Decedent Hernandez, and therefore to Plaintiff.

### AS AND FOR A THIRD CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY – FAILURE TO WARN

133.   Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

134.   Defendants knew or should have known that exposure to fluorochemical products presented a substantial danger when used because it is hazardous to human health and the environment.

135.   Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling fluorochemical products would result in physical harm to Decedent Hernandez.

136.    Ordinary consumers of Defendants' fluorochemical products would not have recognized the risks.

137.    Defendants failed to adequately warn Decedent Hernandez of the potential risks of fluorochemical products.

138.    Adequate instructions and warnings on the fluorochemical products could have reduced or avoided these foreseeable risks of harm to Decedent Hernandez's health.

139.    Had Defendants provided adequate warnings, Decedent Hernandez could have taken measures to avoid or lessen the exposure.

140.    The lack of sufficient warnings was a substantial factor in causing Decedent Hernandez's harm and therefore Plaintiff's harm.

141.    Defendants' failure to warn was a direct and proximate cause of Decedent Hernandez's cancer and untimely death.

142.    Defendants' failure to provide adequate and sufficient warnings for the fluorochemical products that they manufactured, marketed, and sold renders the fluorochemical products defective products.

143.    As a direct and proximate result of Defendants' defective design, Decedent Hernandez, and therefore Plaintiff has suffered and will continue to suffer some or all of the following damages:

a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

b. Physical injury, both temporary and permanent;

c. Economic Damages;

d. Severe and significant emotional distress and mental pain and suffering;

e. Humiliation, embarrassment and fear;

f. Loss of enjoyment of life;

g. Loss of life;

h. Annoyance and inconvenience; and

i. Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

144.    As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Decedent Hernandez and therefor Plaintiff.

145.    Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of Decedent Hernandez and therefore Plaintiff.

## AS AND FOR A FOURTH CAUSE OF ACTION
### NEGLIGENCE

146.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

147.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of fluorochemical products, Defendants owed a duty to Decedent Hernandez to exercise reasonable care in the instructing, labeling, and warning of the handling, control, use and disposal of Defendants' fluorochemical products.

148.    Defendants also voluntarily assumed a duty towards Decedent Hernandez by affirmatively representing to Decedent Hernandez that Defendants' previously detailed acts and/or omissions were not causing any physical harm or other damage to him, and that Defendants' fluorochemical products were safe to use.

149.     Defendants' fluorochemical products are inherently dangerous substances and Defendants' owed a duty of care towards the Decedent Hernandez that was commensurate with the harmful nature of the fluorochemical products, and the dangers involved with exposure to fluorochemical products.

150.     Defendants failed to correct, clarify, rescind, and/or qualify its representations to Decedent Hernandez that Defendants' acts and/or omissions were not causing any physical harm and/or damage to him, or that the fluorochemical products were safe to use.

151.     Despite knowing that their fluorochemical products are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants failed to use reasonable care when they: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold fluorochemical products; (b) issued instructions on how fluorochemical products should be used and disposed of; (c) failed to recall and/or warn the users of fluorochemical products of the dangers to human health and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their fluorochemical products.

152.     But for Defendants' negligent acts and/or omissions, Decedent Hernandez would not have been exposed to unhealthy levels of fluorochemicals.

153.     Defendants' failure to act with reasonable care to (1) design a product to perform safely; (2) failure to issue an adequate warning or instruction on the use of fluorochemical

products warning and; (3) failure to issue a recall, were substantial factors in causing Decedent Hernandez's and therefore Plaintiff's harm.

154.    Defendants knew or reasonably should have known that users would not realize the danger Defendant's fluorochemical products posed to human health.

155.    A reasonable manufacturer or distributor under the same or similar circumstances would have warned of the danger.

156.    Defendants' negligent acts and omissions directly and proximately caused Decedent Hernandez's cancer and directly and proximately caused damage to Decedent Hernandez and therefore Plaintiff in the form of severe personal injuries, pain, suffering, emotional distress, and death.

157.    Decedent Hernandez had permanent and lasting detrimental health effects due to Decedent Hernandez's past injuries directly and proximately caused by Defendants' negligent acts or omissions.

158.    It has been reasonably foreseeable to Defendants for at least several decades that Defendants' negligent acts and/or omissions would directly and proximately cause bodily injury and economic damage to Decedent Hernandez and Plaintiff including the injuries and damages that Decedent Hernandez suffered from.

159.    Defendants' were conscious of the dangers of fluorochemical products, and its negligent acts or omissions, and were conscious that bodily injury to Decedent Hernandez would or was likely to result from the fluorochemical products and Defendants' negligent acts and/or omissions. Nevertheless, with reckless indifference to these consequences, and as previously detailed, Defendants consciously and intentionally acted negligently and/or omitted the duties

Defendants knew it owed to Decedent Hernandez, other exposed individuals, and the public at large, and Decedent Hernandez and Plaintiff were harmed as a result.

160.    The acts and omissions of Defendants were negligent, intentional, reckless, malicious, willful and/or wanton, and as a direct and proximate result Decedent Hernandez and therefore Plaintiff suffered some or all of the following damages:

        a. Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

        b. Physical injury, both temporary and permanent;

        c. Economic Damages;

        d. Severe and significant emotional distress and mental pain and suffering;

        e. Humiliation, embarrassment and fear;

        f. Loss of enjoyment of life;

        g. Loss of life;

        h. Annoyance and inconvenience; and

        i. Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

## AS AND FOR A FIFTH CAUSE OF ACTION

## CONCEALMENT,  MISREPRESENTATION AND FRAUD

161.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

162.    Defendants knowingly, intentionally, maliciously, willfully, wantonly, recklessly and/or negligently failed and/or refused to advise Decedent Hernandez of the dangers and/or health risks posed by Defendants' fluorochemical products.

163.    Defendants negligently, knowingly, maliciously, willfully, wantonly, recklessly, intentionally, and/or negligently withheld, misrepresented, and/or concealed information regarding Defendants' fluorochemical products from Decedent Hernandez who had a right to know of information which would have prevented Decedent Hernandez from being exposed and/or continuing to be exposed to the fluorochemical products.

164.    For at least several decades, Defendants had knowledge or the means of knowledge that Defendants' fluorochemical products were causally connected with or could increase the risk of causing damage to humans and animals, including knowledge of statistically significant findings showing a causal connection between exposure to fluorochemical products and physical injuries in humans and animals.

165.    In connection with the fluorochemical products, Defendants have had and continue to have a general duty of care to disclose to Decedent Hernandez and therefore Plaintiff the actual and potential harm to their persons as a direct and proximate result of Defendants' acts and/or omissions, including a general duty of care to disclose to Decedent Hernandez that Defendants had, and were continuingly, exposing Decedent Hernandez to harmful levels of fluorochemicals.

166.    In addition to its general duty of care, Defendants also voluntarily assumed a duty to disclose to Decedent Hernandez the actual and potential harm to his body as a direct and proximate result of Defendants' acts and/or omissions, including a duty to disclose to Decedent Hernandez that Defendants had exposed, and were continuingly exposing Decedent Hernandez to harmful fluorochemical products, which duty was voluntarily assumed by affirmatively representing to Decedent Hernandez that the Defendants and their fluorochemical exposure were

harmless, when Defendants knew and/or reasonably should have known that the Defendants' fluorochemical products caused, and were continuing to cause, bodily injury.

167.    Through Defendants' superior knowledge, responsibility, and/or control over the fluorochemical products, and Defendants' voluntary actions and/or representations, a relationship of trust and confidence existed between Defendants and Decedent Hernandez.

168.    Despite Defendants' knowledge regarding fluorochemical exposure, and despite Defendants' duties to disclose to Decedent Hernandez, Defendants negligently, maliciously, knowingly, willfully, wantonly, recklessly and/or intentionally withheld, misrepresented, and/or concealed information from Decedent Hernandez regarding exposure to fluorochemical products.

169.    Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure from Decedent Hernandez with the intention to mislead and/or defraud him into believing that their fluorochemical exposure was not harmful, and to mislead and/or defraud him into continuing to use the fluorochemical products.

170.    Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure that was a substantial factor in causing Decedent Hernandez's harm and death.

171.    As a direct and proximate result of the aforesaid acts and/or omissions by Defendants, acting for and on its own behalf and as agent, ostensible agent, employee, conspirator and/or joint venture of others, Decedent Hernandez was exposed to Defendants' fluorochemical products and was injured.

172.    Defendants not only withheld, misrepresented, and/or concealed material information from Plaintiff, but also committed fraud against Decedent Hernandez by affirmatively representing to Decedent Hernandez that their fluorochemical products were

harmless and/or did not present any risk of harm, when Defendants knew, reasonably should have known, and/or with utter disregard and recklessness as to whether it was true or not, that Defendants' fluorochemical products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Decedent Hernandez.

173.    Defendants' representations to Decedent Hernandez were knowingly, intentionally, negligently, and/or recklessly false.

174.    Defendants had, and continue to have, a duty of care to provide Decedent Hernandez, with truthful representations regarding the actual and potential harm to his person as a direct and proximate result of Defendants' acts and/or omissions, and Defendants voluntarily assumed a duty of care to provide Decedent Hernandez with truthful representations regarding Defendants' fluorochemical products and the actual and potential harm to his persons as a direct and proximate result of Defendants' acts and/or omissions.

175.    Defendants' affirmative representations and/or omissions to Decedent Hernandez were false and were material to Decedent Hernandez in forming his belief that Defendants' fluorochemical products were safe, in causing him to continue to use the fluorochemical products, and in causing him to not seek treatment and/or ways to remedy his past and continuing exposure to fluorochemical products.

176.    Defendants made the affirmative representations and/or omissions to Decedent Hernandez with the intention that Decedent Hernandez would be misled into relying on such affirmative representations and/or omissions.

177.    Decedent Hernandez relied on Defendants' affirmative representations and/or omissions in forming his belief that Defendants' fluorochemical products were safe in causing

them to continue to use the fluorochemical products, and in not seeking treatment and/or ways to remedy his past and continuing exposure to Defendants' fluorochemical products.

178.    Decedent Hernandez and therefore Plaintiff were damaged and physically harmed as a direct and proximate result of their justified reliance on Defendants' affirmative, fraudulent representations and/or omissions and, as a direct and proximate result of such justified reliance, Decedent Hernandez continued to use the fluorochemical products.

## AS AND FOR A SIXTH CAUSE OF ACTION

### NEGLIGENCE PER SE

179.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

180.    One or more federal statutes, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 6921-6939e, impose duties of care on Defendants with regard to Defendants' actions and/or omissions towards Decedent Hernandez and/or Decedent Hernandez's safety.

181.    By Defendants' acts and/or omissions resulting in harm to Decedent Hernandez and therefore to Plaintiff, Defendants' violated and/or continue to violate and/or breach one or more federal statutes and/or duties, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 6921-6939e, constituting negligence per se, including liability for all injuries to Decedent Hernandez and Plaintiff associated with the fluorochemical products.

182.    Defendants' violation of law and breach of its statutory duties directly and proximately caused damage to Decedent Hernandez and Plaintiff in the form of economic damage, bodily injury and death, for which Defendants are liable.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### PAST TRESSPASS AND BATTERY

183.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

184.    Defendants have known for several decades that their fluorochemical products are harmful and toxic to humans and animals, and once ingested, will remain in a person's body for a long time, including through binding to blood and/or tissues.

185.    Despite such knowledge, Defendants continued to use the fluorochemical products, which caused harmful physical contact with Decedent Hernandez.

186.    Defendants' continued actions with knowledge that such actions would result in harmful physical contact with Decedent Hernandez demonstrate intent and/or reckless indifference by Defendants without regard to the harm they have caused and will cause.

187.    Defendants' intentional acts and/or omissions resulted in fluorochemicals, in the body of Decedent Hernandez or otherwise unlawful and harmful invasion, contact, and/or presence of fluorochemicals in Decedent Hernandez's body, which interfered with Decedent Hernandez's rightful use and possession of Decedent Hernandez's body.

188.    The fluorochemicals present in and/or on Decedent Hernandez's body originating from Defendants' fluorochemical products were at all relevant times hereto, the property of Defendants.

189.    The invasion and presence of the fluorochemical products in and/or on Decedent Hernandez's body was unconsented and without permission or authority from Decedent Hernandez or anyone who could grant such permission or authority.

190.    Defendants' intentional acts and/or omissions were done with the knowledge and/or belief that the invasion, contact, and/or presence of fluorochemical products onto, and/or into Decedent Hernandez's body were substantially certain to result from those acts and/or omissions.

191.    Harmful contact with Decedent Hernandez's body was the direct and/or indirect result of Defendant's intentional acts and/or omissions.

192.    The presence and continuing presence of the fluorochemical products in and/or on Decedent Hernandez's body was offensive, unreasonable, and/or harmful and constituted a permanent trespass and battery.

193.    Defendants' past trespass and battery upon Decedent Hernandez's body directly and proximately caused damage to Decedent Hernandez and therefore Plaintiff in the form of bodily injury and death, for which Defendants' are liable.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

## NEGLIGENT, INTENTIONAL, AND RECKLESS INFLICTION OF EMOTIONAL DISTRESS

194.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action

195.    Defendants' acts and/or omissions were negligent, intentional, and/or reckless, including Defendants' continued pollution of the environment and resultant exposure of Decedent Hernandez to harmful fluorochemical products, despite knowing for decades that such exposure was causing and would continue to cause harm and/or unacceptable risk of harm to Decedent Hernandez.

196.    Defendants' negligently, knowingly and/or intentionally withheld and concealed material information from and/or affirmatively misrepresented to Decedent Hernandez that they were not exposed to harmful fluorochemical products and/or that the fluorochemical products were not causing or creating any risk of harm to them, despite knowing at the time these concealments and/or misrepresentations were made that the fluorochemical products were causing and would continue to cause harm and/or unacceptable risk of harm to persons, including Decedent Hernandez.

197.    At the time of Defendants' negligent, knowing, and/or intentional acts and/or omissions, it was foreseeable to Defendants and Defendants were certain and/or substantially certain that its actions and/or omissions would cause emotional distress to Decedent Hernandez.

198.    Defendants' acts and/or omissions were extreme, outrageous, intolerable, and/or offended the generally accepted standards of decency and morality.

199.    By continuing to expose Decedent Hernandez to harmful fluorochemical products, and continuing to misrepresent to Decedent Hernandez that the fluorochemical products were not and would not cause them harm or risk of harm and/or continuing to withhold and/or conceal from Decedent Hernandez material information on such issues, despite knowing that the fluorochemical products were causing and would continue to cause harm and/or risk of harm, Defendants acted in an extreme, outrageous, and intolerable manner which offended any generally accepted standard of decency and morality.

200.    Defendants' acts and/or omissions resulting in Defendants' concealment and/or misrepresentations, directly and proximately caused physical harm and death to Decedent Hernandez.

201.    Defendants' acts and/or omissions resulting in Defendants' concealment and/or misrepresentations, directly and proximately caused great emotional suffering and distress to Decedent Hernandez.

202.    Defendants' extreme, outrageous and intolerable actions were a substantial factor in causing Decedent Hernandez to suffer severe physical, mental, and emotional distress.

203.    As a direct and proximate result of Defendants' extreme, outrageous and intolerable actions, Decedent Hernandez suffered severe physical, mental, and emotional distress.

204.    No reasonable person could be expected to endure the mental anguish caused by the knowledge that entities have negligently, knowingly, and/or intentionally exposed them to years of harmful contact with AFFF containing PFOA or PFOS and/or their precursor chemicals and has furthermore actively misrepresented and/or concealed such danger from them, while reaping hundreds of millions of dollars in profits as a direct and proximate result.

## AS AND FOR AN NINTH CAUSE OF ACTION

### WRONGFUL DEATH

205.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

206.    As a direct and proximate result of the previously alleged conduct all of which was negligent, grossly negligent, wanton or reckless, Defendants caused the death of Decedent Hernandez, by their wrongful conduct.

207.    Decedent Hernandez suffered personal injuries, including excruciating pain and suffering, mental anguish and emotional distress, resulting in his death. The pain and loss of

dignity suffered by Decedent Hernandez caused his family to suffer more than normal grief upon his death.

208.     As a direct and proximate result of the wrongful death suffered by Decedent Hernandez, Plaintiff asserts a claim for judgment for compensatory and punitive damages against Defendants, including but not limited to, medical expenses, funeral expense and other related costs, pain and suffering, grief suffered by statutory beneficiaries, mental anguish, disability and loss of life, in an amount to be determined by the jury, as well as costs and attorneys fees, plus all other relief of which the Plaintiff is entitled by law.

## <u>CLAIM FOR PUNITIVE DAMAGES</u>

209.     Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

210.     At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the fluorochemical products that were used by Decedent Hernandez and that resulted in the physical bodily injuries that Decedent Hernandez suffered, and which caused his death.

211.     At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that their fluorochemical products were toxic chemicals capable of causing harm to human health.

212.     Defendants' negligent, reckless, willful, fraudulent, and/or wanton actions and/or intentional failures to act caused Decedent Hernandez to be exposed to fluorochemical products.

213.     The willful, wanton, malicious, fraudulent and/or reckless conduct of Defendants, includes, but is not limited to:

a. issuing no warnings and failing to divulge material information concerning the release of fluorochemicals, including but not limited to PFOA and PFOS;

b. failing to take all reasonable measures to ensure fluorochemical products would be used effectively and properly disposed of;

c. failing to prevent the foreseeable impacts of fluorochemical exposure upon the Decedent Hernandez.

d. withholding, misrepresenting, and/or concealing information regarding the releases of fluorochemical products and exposure from Decedent Hernandez, other exposed individuals, and the public at large, with the intention to mislead and/or defraud them into believing that their exposure to fluorochemical products was not harmful, and to mislead and/or defraud them into continuing to purchase and consume drinking water contaminated with fluorochemical products.

214.    As a result of Defendants' conduct, Decedent Hernandez was forced to incur significant costs related to the harm caused by Defendants' fluorochemical products and suffered serious, debilitating, and severe physical, mental, and emotional distress, and death from his cancer caused by Defendants' fluorochemical products.

215.    Defendants have demonstrated an outrageous conscious disregard for the physical safety of Decedent Hernandez and acted with implied malice, warranting the imposition of punitive damages.

216.    Upon information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award the Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A. Compensatory damages that exceed the jurisdictional limit of this court;

B. Punitive damages that exceed the jurisdictional limit of this court;

C. Reasonable fees for attorneys and expert witnesses;

D. Costs and disbursements of this lawsuit;

E. Interest on the damages according to law; and

F. Any other and further relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: May 3, 2024            Respectfully submitted,

SCHULTE URBON YONTS, PLLC

By: /s/ Mark E. Yonts
Mark E. Yonts, Esq.
127 East 3rd Street
Covington, Kentucky 41011
859-491-1234
myonts@urbonyonts.com


By: /s/ Daniel J. Urbon
Daniel J. Urbon, Esq.
127 East 3rd Street
Covington, Kentucky 41011
859-491-1234
durbon@suylaw.com